*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

STEPHAN JARON DELANEY,

Defendant-Appellant.

UNPUBLISHED
November 17, 2025
12:08 PM

No. 367101
Berrien Circuit Court
LC No. 2021-003492-FH

Before: LETICA, P.J., and M. J. KELLY and MARIANI, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of one count of possession of methamphetamine with intent to deliver, MCL 333.7401(2)(b)(*i*), MCL 333.7214(c)(*ii*); three counts of felon in possession of a firearm (felon-in-possession), MCL 750.224f; one count of felon in possession of ammunition, MCL 750.224f(6); and four counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to serve concurrent terms of 260 to 480 months' imprisonment for possession of methamphetamine with intent to deliver, 48 to 480 months' imprisonment for each count of felon-in-possession, and 48 to 480 months' imprisonment for felon in possession of ammunition. The trial court also sentenced defendant to serve terms of two years' imprisonment for each count of felony-firearm, which were to be served concurrently to one another but consecutively to their corresponding underlying convictions of felon-in-possession and felon in possession of ammunition. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of October 18, 2021, members of the Berrien County Department of Public Safety, several of whom were also members of the Southwest Enforcement Team (SWET), executed a no-knock search warrant on defendant's property located at 807 Broadway Street in Benton Harbor. The warrant authorized a search for evidence of controlled substances, drug trafficking, and firearms anywhere such evidence could reasonably be found, including the house, out buildings, and any vehicles on or associated with the property. Defendant, Cameron Delaney (defendant's son), Michael Delaney (defendant's brother), Melissa Noles (the

-1-

girlfriend of defendant's brother), a woman named Sabrina, and Mariah Adams (defendant's friend) were all present in the house at the time that the search warrant was executed.[1]

The lead investigating detective, Detective Robert Shepherd, testified that the searching officers did not find drugs while searching defendant's home, but they did find some drug paraphernalia in the basement, as well as "numerous loaded magazines, ammunition, empty gun boxes, packaging for" a laser sight for a handgun, "little Ziploc baggies," and small plastic sandwich bags, almost all of which was located in defendant's bedroom. Officers also found in Michael's bedroom the keys to a Chevrolet Malibu that was parked by the side of the house, which they eventually determined was registered to Noles. Officers used the keys to pop the trunk, in which they found a shotgun and a large white backpack; the white backpack contained various types of ammunition, two "novelty" hand grenades, and a smaller black backpack. The black backpack contained two loaded handguns, one of which had an attached laser sight that matched the packaging found in defendant's room; several loaded and unloaded magazines; several different types of ammunition; a tied-off bag of crystal methamphetamine and 32 methamphetamine pills, which altogether totaled to over 10 grams; a digital scale with methamphetamine residue on it; "small plastic baggies" matching the ones found in defendant's bedroom; a green folder containing several identifying documents belonging to defendant; and a wallet containing defendant's bank cards, driver's license, and social security card. Officers also searched defendant's black Lincoln SUV, which was parked in the driveway. In the center console, the officers found gun accessories, rifle ammunition, identifying documents belonging to defendant, and small plastic sandwich bags matching those found in the backpack and in defendant's room.[2]

The search warrant arose from defendant's interaction with Kiersten Ridenour two days earlier. Ridenour testified that she first met defendant on Facebook in the summer of 2021, and on October 16, 2021, she accepted defendant's invitation to visit him that evening at his residence on 807 Broadway Street. Ridenour arrived at defendant's home at approximately 11:00 pm, and after spending approximately 20 minutes there, Ridenour drove herself and defendant to Paw Paw so that defendant could buy her cocaine from his cousin pursuant to a prearranged meeting.[3] Ridenour testified that upon entering her car, defendant placed a black handgun in her glove

---

[1] According to trial testimony, defendant, Michael, and Sabrina permanently resided in the house, whereas Cameron and Noles occasionally resided there, and Adams was only visiting defendant at that time.

[2] Pursuant to the parties' stipulation, relevant recorded video footage from a searching officer's body-worn camera was shown at trial.

[3] The text-message exchange between Ridenour and defendant that occurred immediately prior to Ridenour's trip to defendant's house was admitted as evidence at trial. In the exchange, Ridenour asked defendant if he knew anyone from whom she could get cocaine; defendant responded that he did and that he had arranged a meet-up in Paw Paw to purchase Ridenour one gram of cocaine. Defendant further indicated that the cocaine he planned on buying was good product but that he "stay[ed] with the ice" because he "just don't [sic] have the clientele to get [the cocaine] off." Ridenour later explained that "ice" was commonly used to refer to methamphetamine.

compartment. Ridenour also testified that she was from northern Indiana and was therefore unfamiliar with the Benton Harbor and Paw Paw areas, so defendant directed her on how to get to and from the pick-up location in a Wal-Mart parking lot in Paw Paw.

Ridenour further testified that once they were in the Wal-Mart parking lot, defendant got out of her car, sat in another car with a different individual for a few minutes, and then returned to her car with one gram of what she believed to be cocaine in a tied-off sandwich bag. Ridenour and defendant arrived back at defendant's home at around midnight on October 17, 2021, at which point defendant gave her the drugs and she snorted "[o]ne or two lines." Ridenour stated that she did not "recall anything after that point" and that the next thing she remembered was "w[aking] up in a hospital room." Video surveillance footage from a local hospital showed a man—later identified as defendant—and an unknown woman dropping off an unconscious Ridenour at approximately 8:00 a.m., and then parking Ridenour's car and leaving in a black Lincoln SUV later determined to be registered to defendant. Subsequent testing of the substance defendant had given to Ridenour revealed that Ridenour had ingested fentanyl, not cocaine.

At trial, Detective Shepherd testified about his involvement in the case, including his interview of Ridenour at the hospital, additional steps taken to identify defendant as the suspect, his process of drafting and obtaining the search warrant, and the execution of the search warrant on defendant's property. Several other officers involved in the search also testified about their role in the search and what they found during it. Additionally, Lieutenant Shawn Yech, who had significant experience handling cases involving narcotics and drug trafficking, testified for the prosecution as an expert in the sale and distribution of narcotics. Lieutenant Yech testified about how methamphetamine was commonly packaged, what items were typically used to package methamphetamine for distribution, and how methamphetamine was commonly distributed. He also explained the quantity and cost of methamphetamine ordinarily purchased and consumed by an average user. Lieutenant Yech testified that the methamphetamine seized during the search was, in his opinion, "for sales and distribution" based on its total weight, the location and circumstances in which it was found, and the other items found along with it during the search. Lieutenant Yech further testified that the total weight of the methamphetamine seized was "much more than any [one particular] user would need." According to Lieutenant Yech, the fact that much of "the methamphetamine was stamped into pills [wa]s also consistent with" sales and distribution rather than personal use, and the content of a text-message exchange between Ridenour and defendant indicated that defendant had purchased cocaine for Ridenour because he only had "ice," a term commonly used to refer to methamphetamine.

Defendant was convicted and sentenced as described. This appeal followed.

## II. SEARCH WARRANT

In both his appellate brief and his supplemental Standard 4[4] brief, defendant argues that the trial court erred by admitting at trial the evidence seized during the search of his property.

---

[4] Defendant filed a supplemental Standard 4 brief pursuant to Michigan Supreme Court Administrative Order No. 2004-6, 471 Mich c, cii (2004).

Prior to trial, defendant moved to suppress this evidence, arguing that the search warrant was invalid. The trial court disagreed and denied the motion. Defendant raises various challenges to that conclusion, but we see no reversible error in it.

## A. ADDITIONAL BACKGROUND

Before turning to defendant's challenges, additional background regarding the warrant at issue and the court's ruling on defendant's motion to suppress is in order. The affiant for the search warrant was Detective Shepherd, the lead investigating detective in this case, who had worked in law enforcement since 2018 and was a member of SWET. He stated in the affidavit that he received information from multiple named individuals, including several police officers and Ridenour. The affiant stated that, during interviews with the police, Ridenour informed them that, within the preceding 24 hours, she had driven from her Indiana home to 807 Broadway Street in Benton Harbor to obtain drugs from a man she had met online and that, shortly after her arrival, the man took her to somewhere in Paw Paw to purchase cocaine from his cousin. Ridenour also stated that "the last thing she remembered" before waking up in the hospital was that she snorted "2 lines of what she believed to be cocaine" around midnight.

Ridenour allowed the affiant to search her phone, and the affiant observed several photos of the man that Ridenour had visited, as well as "multiple text messages" between the two in which they discussed the purchase of cocaine. Additionally, Ridenour allowed the affiant to search her purse, and the affiant discovered "a small plastic sandwich bag with blue powder and [a] rock like substance," which Ridenour stated was "what [the man] cut up for [her] last night." In addition to gathering this information from Ridenour, the affiant reviewed hospital surveillance footage of the man and an unknown woman dropping off "an obviously unconscious" Ridenour and leaving in "a black Lincoln SUV," and the affiant's database search of the SUV's partial license plate revealed that the SUV was registered to defendant at 807 Broadway Street. The affiant also visually confirmed that the man with whom Ridenour had met up was defendant by comparing photos of the man from Ridenour's phone and a photo of defendant affiliated with the SUV registration and the Broadway Street address.

The affiant further stated that, during his investigation, he found a police report in the department's system, which indicated that defendant was being investigated for the October 8, 2021 felonious assault of a man in an unrelated case. The investigating officer assigned to that case informed the affiant that the victim in that case had identified defendant as his assailant in a photo line-up and that video surveillance footage from a gas station showed defendant driving away from the gas station to 807 Broadway in the same black Lincoln SUV.

The affidavit indicated that, based on the information summarized above and the affiant's training and experience, the affiant believed that the execution of a search warrant for the property at 807 Broadway Street—including the house, "out buildings" on the property, and "any persons and vehicles associated to or on the property"—would "assist with the locating of evidence" that demonstrated defendant's "involvement in the distribution of narcotics and assault with a deadly weapon." A magistrate found that the affidavit had provided sufficient evidence to satisfy the probable-cause standard and issued a no-knock warrant allowing officers to search the property on Broadway Street for—and seize, if found—evidence of controlled substances; evidence of drug

-4-

trafficking, such as sales and packaging supplies; evidence of firearms, ammunition, and firearm accessories; and evidence of occupancy or residency, such as "[r]esidency papers" and "car keys."

As noted, during pretrial proceedings, defendant moved to suppress the evidence resulting from the search warrant, arguing, in relevant part, that (1) the warrant was invalid because there was insufficient probable cause to support it; (2) the information in the affidavit was stale because it was, in part, based on an incident that occurred more than nine days before the issuance of the search warrant; and (3) there was no sufficient basis for the police to execute the warrant without first knocking and announcing their presence. The prosecution responded, in relevant part, that (1) there was a substantial basis for a probable-cause finding; (2) the information in the affidavit was not stale because the incident defendant was referring to involved a firearm, and a firearm, even if used, is unlikely to be disposed of within a nine-day timeframe; and (3) Detective Shepherd's cited concerns about safety and destruction of evidence were valid exceptions to the knock-and-announce requirement.

Following a hearing, the trial court denied defendant's motion to suppress. The court found that, when reviewing the search warrant and supporting affidavit in a common-sense and realistic manner and affording the magistrate's probable-cause determination great deference, there was a substantial basis for a probable-cause finding. Specifically, the court found that the information in the affidavit—Ridenour's statements to the police, in particular—tied the alleged offenses to defendant, defendant's black Lincoln SUV, and defendant's property at 807 Broadway Street. Regarding the staleness issue, the court concluded that the information was sufficiently "fresh" because the incident involving the distribution of drugs to Ridenour had occurred the night prior and, although the incident involving the gun occurred nine days prior, a firearm is very likely to be kept by an individual rather than disposed of during a nine-day timeframe. And regarding the knock-and-announce requirement, the court held that Detective Shepherd cited concerns about safety and destruction of evidence as his basis for requesting a no-knock warrant, both of which are valid exceptions to the knock-and-announce requirement. The court further explained that, even if a violation had occurred, suppression of the evidence was not an appropriate remedy because the violation would have only briefly delayed the officers' entry and their ensuing discovery of the evidence during the execution of an otherwise valid search warrant.

## B. STANDARDS OF REVIEW

"We review a trial court's findings of fact associated with a motion to suppress evidence for clear error, but we review de novo both questions of law relevant to the suppression motion and the judge's ultimate decision." *People v Robe*, 337 Mich App 142, 144 n 2; 972 NW2d 52 (2021). "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Gingrich*, 307 Mich App 656, 661; 862 NW2d 432 (2014) (quotation marks and citation omitted). The trial court's factual determinations are afforded deference, *id.*, and "[w]e overstep our review function if we substitute our judgment for that of the trial court and make independent findings," *People v Stricklin*, 327 Mich App 592, 598; 935 NW2d 59 (2019) (quotation marks and citation omitted).

## C. PROBABLE CAUSE

Defendant first argues that there was insufficient probable cause to support the search warrant because the affidavit for the search warrant failed to establish a sufficient nexus between the alleged criminal activity—specifically, drug trafficking—and his property. We disagree.

The United States and Michigan Constitutions protect individuals from unreasonable searches and seizures by the government. See US Const, Am IV; Const 1963, art 1, § 11. "[R]easonableness is always the touchstone of Fourth Amendment analysis," and "the general rule is that officers must obtain a warrant for a search to be reasonable under the Fourth Amendment." *People v Hughes*, 506 Mich 512, 524-525; 958 NW2d 98 (2020) (quotation marks and citations omitted). A search warrant may only be issued if probable cause exists to justify the search. US Const, Amend IV; Const 1963, art 1, § 11; MCL 780.651(1). Probable cause to issue a search warrant exists if "there is a substantial basis for inferring a fair probability that contraband or evidence of a crime will be found in a particular place." *People v James*, 327 Mich App 79, 90; 932 NW2d 248 (2019) (quotation marks and citation omitted). A probable-cause determination must be based on the facts presented to the judge or magistrate by oath or affirmation. *People v Waclawski*, 286 Mich App 634, 698; 780 NW2d 321 (2009); see also MCL 780.651.

When probable cause is averred in an affidavit, "the affidavit must contain facts within the knowledge of the affiant and not mere conclusions or beliefs." *James*, 327 Mich App at 91 (quotation marks and citation omitted); see also MCL 780.653. Although an affiant "may not draw his or her own inferences" based solely on his or her experience, "the affiant's experience is relevant to the establishment of probable cause." *Waclawski*, 286 Mich App at 698. Further, an affidavit prepared on the basis of information provided to the affiant by a named person must provide sufficient facts from which a judge or magistrate could find that "the named person has personal knowledge" of the information. *People v Keller*, 479 Mich 467, 482; 739 NW2d 505 (2007), citing MCL 780.653. "[I]dentified citizens and police officers [are] presumptively reliable." *People v Powell*, 201 Mich App 516, 523; 506 NW2d 894 (1993). "An independent police investigation that verifies information provided by an informant can also support issuance of a search warrant." *People v Ulman*, 244 Mich App 500, 509-510; 625 NW2d 429 (2001).

When there is a challenge to a search warrant, the reviewing court must read the affidavit in support of the warrant "in a common sense and realistic manner, not a crabbed or hypertechnical manner." *People v Mullen*, 282 Mich App 14, 27; 762 NW2d 170 (2008) (quotation marks and citation omitted). Accordingly, this Court looks to whether "a reasonably cautious person could have concluded that there was a substantial basis for the finding of probable cause to issue a search warrant." *Waclawski*, 286 Mich App at 699. Generally, "if a warrant is determined to be invalid because it lacked a probable-cause basis or was technically deficient in some other manner, any evidence seized pursuant to that warrant . . . is inadmissible as substantive evidence in related criminal proceedings." *People v Hellstrom*, 264 Mich App 187, 193; 690 NW2d 293 (2004). "A magistrate's finding of probable cause and his or her decision to issue a search warrant should be given great deference and only disturbed in limited circumstances." *People v Franklin*, 500 Mich 92, 101; 894 NW2d 561 (2017).

In arguing that there was insufficient probable cause to support a search of the Broadway Street property for evidence of drug trafficking, defendant asserts that the affidavit only related to drugs found in Ridenour's purse and drugs that defendant purchased for Ridenour in the Wal-Mart parking lot, which was insufficient to show a "pattern of illegal activity" or "distribution of drugs

at [defendant's] residence." But, as discussed above, the affidavit also included statements from Ridenour and references to Ridenour's messages to defendant, all of which established that Ridenour had reached out to defendant to purchase cocaine; that she drove from Indiana to the Broadway Street property to do so; that after she arrived at the Broadway Street property, defendant took her to somewhere in Paw Paw to purchase cocaine from his cousin; that after purchasing the drugs, defendant "cut up" the drugs for her to use; and that, at around midnight, she snorted two lines of the drugs that defendant "cut up" for her, but could not remember much else after that. The affidavit also contained a detailed description of the affiant's investigation following his interview of Ridenour and his consensual search of her belongings; this information included his review of text messages, video surveillance footage, registration information for the black SUV, and documents and photos from the Secretary of State, all tying defendant to the incident and the Broadway Street property. All of this provided more than enough to lead a reasonably cautious person to conclude that there was a substantial basis for finding probable cause to issue the search warrant with respect to drugs and drug trafficking—that is, for inferring a fair probability that such contraband or evidence would be found in the specified areas of the Broadway Street property. See *James*, 327 Mich App at 90; *Waclawski*, 286 Mich App at 699.[5]

Defendant also briefly argues in his supplemental Standard 4 brief that there was insufficient probable cause to support a search of the Broadway Street property for evidence of firearms and ammunition. We disagree. As discussed above, the affidavit contained significant information to suggest that evidence of firearms and ammunition would be found at the Broadway Street address, including a police report in an unrelated case indicating that defendant was suspected of assaulting a man with a gun, the victim in the unrelated case positively identifying defendant as his assailant, video surveillance footage from a gas station showing defendant driving to the Broadway Street address in a Black Lincoln SUV registered to him, and Secretary of State information indicating that 807 Broadway Street was defendant's listed home address. Regardless, as discussed, there was sufficient probable cause to support a search warrant as it related to drugs and drug trafficking, and the scope of the search authorized by that portion of the search warrant was broad and permitted police officers to search any place within the house in which drugs could have been found. See *Keller*, 479 Mich at 479-480. The firearms and ammunition discovered during the execution of this valid portion of the warrant were in plain view and were lawfully seized on that basis as well. See *id*. at 478, 480 n 36.

In sum, a magistrate's probable-cause finding is afforded great deference, *Franklin*, 500 Mich at 101, as are a trial court's factual findings at a suppression hearing, *Gingrich*, 307 Mich

---

[5] While the affidavit does not expressly state that Ridenour and defendant returned to the Broadway Street address after purchasing the drugs in Paw Paw, we agree with the trial court's finding at the suppression hearing that, although omission of this specific point was "perhaps sloppy," it "was not fatal to [a] common sense and realistic reading of this particular affidavit as it's attached to the place to be searched and the evidence to be searched for." See *Mullen*, 282 Mich App at 27. As recognized by the court, neither party disputed that Ridenour and defendant had returned to the Broadway Street address after purchasing the drugs or that Ridenour used the drugs while in defendant's home. Indeed, both parties affirmatively stated these facts during their arguments at the suppression hearing, and defendant states the same on appeal.

App at 661. Having reviewed the record in this light, we conclude that there was sufficient information presented to support—and subsequently uphold—a probable-cause finding. The trial court did not err by denying defendant's motion to suppress on this basis. See *Robe*, 337 Mich App at 144 n 2; *James*, 327 Mich App at 90-91; *Waclawski*, 286 Mich App at 699.

## D. STALENESS

Defendant also argues that the warrant was invalid because the information in the affidavit—specifically, the information relevant to the firearms-related charges—was stale, as it was provided nine days after the alleged felonious assault involving a gun. Although "[t]he passage of time is a valid consideration in deciding whether probable cause exists[,] [t]he measure of the staleness of information in support of a search warrant" is highly dependent on the totality of the circumstances of each case, "including the criminal, the thing to be seized, the place to be searched, and the character of the crime." *People v Brown*, 279 Mich App 116, 128; 755 NW2d 664 (2008). For instance, whether "the property sought . . . is likely to be promptly disposed of or retained by the person committing the offense" would impact a staleness analysis. *People v Russo*, 439 Mich 584, 605-606; 487 NW2d 698 (1992); see also, e.g., *People v Stumpf*, 196 Mich App 218, 226-227; 492 NW2d 795 (1992) (holding that an informant's information in an affidavit regarding the defendant's marijuana grow operation was not stale because "[t]he circumstances of the suspected criminal enterprise" included "ongoing criminal activity" and because "the evidence was not likely to have dissipated despite the passage of time" given that "plants require time to germinate and grow").

Relying on *Russo* and *Stumpf*, the trial court in this case concluded that the information in the affidavit relevant to the firearms-related offenses was not stale. The court found that when "us[ing] our common sense to look at the nature of the evidence" sought, "[a] firearm . . . can be kept," and "using that firearm does not necessarily mean that the item itself is used up or cannot be used again, and would not be kept by a person." The court further found that although "nine days is a lot less fresh information than the night before or earlier that morning," it "really is not a very long timeframe at all when talking about keeping a firearm." Given the holdings in *Russo*, 439 Mich at 605-606, and *Stumpf*, 196 Mich App at 226-227, discussed above, we see no error in the trial court's findings or in its ultimate decision to deny defendant's motion to suppress on this basis. See *Robe*, 337 Mich App at 144 n 2; *Gingrich*, 307 Mich App at 661.

## E. STANDING

In his supplemental Standard 4 brief, defendant also argues that the evidence found in the trunk of Noles's Malibu—namely, the backpack and its contents[6]—was the result of an unconstitutional search and should not have been admitted as evidence at trial because the Malibu did not belong to him. But defendant does not have standing to challenge the constitutionality of the search of Noles's Malibu. Generally speaking, Fourth Amendment rights are personal and

---

[6] As discussed, the backpack contained two loaded guns, ammunition, small plastic sandwich bags, more than 10 grams of methamphetamine (in both crystal and pill form), a digital scale with methamphetamine residue on it, and a host of identifying paperwork belonging to defendant.

cannot be asserted on behalf of another. See *People v Wood*, 447 Mich 80, 89; 523 NW2d 477 (1994). And more specifically, defendant does not argue that he had a legitimate expectation of privacy in the trunk of Noles's car or the backpack found within it. See *People v Mead*, 503 Mich 205, 213-215; 931 NW2d 557 (2019) (recognizing that a passenger of a vehicle ordinarily does not have a legitimate expectation of privacy in the trunk of another person's vehicle but holding that he or she may nonetheless "challenge an alleged Fourth Amendment violation if [he or] she can show under the totality of the circumstances that [he or] she had a legitimate expectation of privacy in the area searched and that [his or] her expectation of privacy was one that society is prepared to recognize as reasonable").

Furthermore, the search warrant specified, in relevant part, "any persons and *vehicles associated to or on the property*" as a place to be searched, and it is clear from the record that Noles's Malibu was at least associated with defendant's property at the time of the search. Video footage from a searching officer's body-worn camera showed the officer discovering a set of car keys in defendant's home and handing them to Detective Shepherd, and Detective Shepherd testified that those keys were subsequently used to unlock Noles's Malibu. And, as discussed, the police had probable cause to believe that drugs, guns, or other related evidence would be found in the places listed in the warrant, and the police could search for that evidence anywhere in the listed places where those things could reasonably be found. See *Keller*, 479 Mich at 479-480, 480 n 36.[7]

In sum, we do not see merit in defendant's challenges to the search warrant and find no error in the trial court's subsequent admission of the evidence from the search at trial.

## III. LIMIT ON CROSS-EXAMINATION

---

[7] In both his appellate brief and supplemental Standard 4 brief, defendant also appears to take issue with the fact that the search warrant in this case was a no-knock warrant. But defendant does not, in either brief, provide any meaningful argument or identify any factual or legal support for any such challenge to the warrant, and a party may not simply announce his position and expect this Court to discover and rationalize the basis for his claims. See *People v Burkett*, 337 Mich App 631, 639 n 4; 976 NW2d 864 (2021). Regardless, Detective Shepherd testified at the suppression hearing that he requested that the warrant be issued as a no-knock warrant because of safety concerns for searching officers and other occupants of defendant's home given defendant's violent criminal history and the fact that the officers would be searching for firearms, and because there was a possibility that any drugs in the home could be quickly disposed of if the police announced themselves ahead of time. As the trial court correctly recognized, both of the bases provided by Detective Shepherd were valid exceptions to the constitutional and statutory knock-and-announce requirement under the circumstances of this case. See *Richards v Wisconsin*, 520 US 385, 394-395; 117 S Ct 1416; 137 L Ed 2d 615 (1997); see also MCL 780.656. And even if a violation of that requirement occurred, suppression of the evidence is not an appropriate remedy for it. See *People v Vasquez*, 461 Mich 235, 241-242; 602 NW2d 376 (1999).

Defendant next argues that, at trial, the trial court impermissibly prohibited defense counsel from questioning Ridenour about matters relevant to show bias. We see no reversible error in the trial court's handling of this issue.

We review "a trial court's ultimate decision regarding a limitation on cross-examination for an abuse of discretion." *People v Daniels*, 311 Mich App 257, 265; 874 NW2d 732 (2015). We also review a trial court's evidentiary rulings for an abuse of discretion. *People v Thorpe*, 504 Mich 230, 251-252; 934 NW2d 693 (2019). An abuse of discretion occurs when the trial court renders a decision that "falls outside the range of reasonable and principled outcomes" or "when it makes an error of law." *People v Wisniewski*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 361978); slip op at 7. "Preliminary questions of law, including whether a rule of evidence precludes the admission of evidence, are reviewed de novo." *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013). "[A] claim that the denial of cross-examination has prevented the exploration of a witness' bias is subject to harmless error analysis." *People v Minor*, 213 Mich App 682, 688; 541 NW2d 576 (1995). Under that analysis, a preserved, nonconstitutional[8] error does not warrant reversal "unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999) (quotation marks omitted).

Generally speaking, evidence of a witness's bias may be brought up on cross-examination because such evidence "is almost always relevant." *People v Layher*, 464 Mich 756, 764; 631 NW2d 281 (2001) (quotation marks and citation omitted). This is because "the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence that might bear on the accuracy and truth of a witness' testimony." *Id*. at 765 (quotation marks and citation omitted). That said, "the trial court has wide discretion regarding admissibility of bias during cross-examination under MRE 611." *Id*.; see also MRE 611(c).

Defendant argues that the trial court abused its discretion by prohibiting defense counsel from asking Ridenour whether she had been charged with any offense in connection with her drug use and possession in this case. According to defendant, the court's decision improperly restricted cross-examination and improperly excluded evidence of bias, which was relevant to Ridenour's credibility as a witness. Defendant never directly states why he believes that this line of questioning was relevant to Ridenour's credibility and bias, but he appears to imply that it would show Ridenour received some sort of favorable treatment in exchange for her testimony. Such evidence of bias may be relevant to credibility. See *Layher*, 464 Mich at 764-765. Pursuant to MCR 6.201(B)(5), however, the prosecution must disclose plea agreements, grants of immunity, or other agreements made in exchange for a witness's testimony, and there is nothing in the record to support defendant's suggestion that Ridenour received any incentive, immunity or otherwise, in exchange for her cooperation. Nor does defendant offer any affidavits, documents, trial evidence, or other relevant proofs suggesting that such an agreement existed. Without any factual support

---

[8] Defendant does not argue that the court's ruling regarding the questioning of Ridenour violated his constitutional rights.

for this claim, we cannot say that the trial court abused its discretion by limiting cross-examination on this topic as it did. See *Daniels*, 311 Mich App at 265.

Even if we concluded otherwise, defendant has failed to show the requisite harm from the alleged error. See *Lukity*, 460 Mich at 495-496. As noted above, there is no evidence—either in the existing record or otherwise provided by defendant—that Ridenour received any sort of favorable treatment in exchange for her cooperation or testimony in this case, or that questioning on the matter would impugn her credibility or reveal her bias. And contrary to defendant's claims, exclusion of this evidence did not "preclude[] defense counsel from attacking [Ridenour's] credibility" on cross-examination. Indeed, during cross-examination and closing argument, defense counsel was able to attack Ridenour's credibility in various ways: by establishing that she could not remember various details from the night in question, including what the gun looked like that defendant purportedly put in her glove compartment before the drug deal or what defendant did with the gun after they returned to his house; by pointing out several differences between her initial statement to the police, her statements to the police a week before trial, and her trial testimony; and by getting her to admit that she felt "incoherent" from drugs while in the hospital at the time of her initial police interview. Defendant has failed to show that questioning Ridenour regarding any charges (or lack thereof) in connection with the instant case would have meaningfully added to this attack, let alone that it more probably than not would have led to a different outcome at trial. See *id*. Accordingly, defendant has shown no basis for relief on this issue.

## IV. LIEUTENANT YECH'S TESTIMONY

Defendant next argues that Lieutenant Yech provided improper expert opinion testimony commenting on his guilt. According to defendant, the trial court plainly erred by admitting this testimony, the prosecutor committed misconduct by eliciting this testimony in the first instance, and defense counsel was ineffective for failing to object when this testimony was offered at trial. We disagree.

As defendant recognizes, his claim that the trial court erred by admitting Lieutenant Yech's testimony is unpreserved and is thus reviewed for plain error affecting substantial rights. See *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Accordingly, to obtain appellate relief, defendant must show: (1) an error occurred, (2) the error was clear or obvious, and (3) the error affected substantial rights. *Id*. at 763. To satisfy the third element, defendant must show that the error "affected the outcome of the lower court proceedings." *Id*. And even when these three requirements are met, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Allen*, 507 Mich 597, 614; 968 NW2d 532 (2021) (quotation marks and citation omitted).

Defendant's challenge to Lieutenant Yech's testimony implicates, and is ultimately foreclosed by, this Court's caselaw regarding drug-profile evidence. Typically provided in the form of expert testimony from police officers, drug-profile evidence is an informal collection of otherwise innocuous characteristics that are "often displayed by those trafficking in drugs." *People v Murray*, 234 Mich App 46, 52-53, 55-56; 593 NW2d 690 (1999) (quotation marks and

citations omitted). Although such evidence cannot be used as substantive evidence of a defendant's guilt, it may be used "as background or modus operandi evidence" to "aid the jury in understanding evidence in controlled substance cases," including "to explain the significance of items seized and the circumstances obtaining during the investigation of criminal activity." *Id*. at 53-54, 56-57. As this Court has explained, expert testimony from an officer that the quantity and packaging of drugs found indicate an intent to distribute, rather than to personally use, the drugs is not considered to be impermissible drug-profile evidence, and such testimony is not rendered inadmissible by the fact that it embraces the ultimate issue to be decided by the jury. *People v Ray*, 191 Mich App 706, 708; 479 NW2d 1 (1991) (holding that officer testimony that the quantity, form, and selling price of crack cocaine found in the defendant's possession "clearly indicated that [the] defendant intended to sell the drugs and not simply use the crack cocaine for personal consumption" was not rendered inadmissible even though it embraced the ultimate issue of intent to deliver); see also *People v Williams (After Remand)*, 198 Mich App 537, 542; 499 NW2d 404 (1993) (relying on *Ray* to hold that "[t]he trial court did not abuse its discretion in admitting the officer's testimony" because "the testimony concerned how the evidence found in [the] defendant's house was routinely used to cut, weigh, package, and sell controlled substances").

In this case, defendant contends that it was improper for Lieutenant Yech to testify that, "in [his] opinion," the methamphetamine found during the search of defendant's property "was for sales and distribution." Defendant does not dispute Lieutenant Yech's qualification as an expert, and Lieutenant Yech explained that his expert opinion about the drugs was informed by their total weight, their packaging, and the location and circumstances in which they were found, as well as by the digital scale containing methamphetamine residue, the packaging material, and the firearms that were also found. Lieutenant Yech explained that his opinion was further informed by defendant's text messages to Ridenour in which he referenced "only having ice for sale, or . . . only keeping ice around," which is slang commonly used to refer to methamphetamine. This was not simply testimony about how "otherwise innocuous characteristics" fit a drug profile, but was instead about the nature and circumstances of the illicit drugs themselves; it fell within the scope of expert officer testimony that may be offered "to aid the jury in understanding evidence in controlled substance cases," including "to explain the significance of items seized and the circumstances obtaining during the investigation of criminal activity." *Murray*, 234 Mich App at 53. And, as this Court has made clear, the fact that such testimony embraced the ultimate issue of defendant's intent to deliver did not render the testimony inadmissible. See *id*. at 54; *Ray*, 191 Mich App at 708; *Williams*, 198 Mich App at 542. Given this binding precedent, we do not see error, let alone plain error, in the admission of Lieutenant Yech's testimony regarding the drugs. See *Carines*, 460 Mich at 763-764.

Regarding defendant's claim that the prosecution committed misconduct by eliciting Lieutenant Yech's testimony, that issue is also unpreserved and similarly reviewed for plain error affecting substantial rights. See *People v Anderson*, 331 Mich App 552, 565; 953 NW2d 451 (2020). For the same reasons discussed above, we see no error or impropriety in the prosecution's decision to elicit Lieutenant Yech's admissible testimony regarding the drugs. And because there was no error in the offering or admission of Lieutenant Yech's testimony, defendant's claim that his counsel was ineffective for failing to object to the testimony at trial also fails. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

## V. SUFFICIENCY AND/OR GREAT WEIGHT OF THE EVIDENCE

In his supplemental Standard 4 brief, defendant also argues (albeit somewhat unclearly) that his convictions are based on legally insufficient evidence and/or are against the great weight of the evidence. We disagree.

Defendant did not "request a new trial based on the great weight of the evidence," so that challenge is not preserved for appellate review. *People v Williams*, 294 Mich App 461, 471; 811 NW2d 88 (2011). We therefore review the issue for plain error affecting substantial rights. *People v Cameron*, 291 Mich App 599, 617; 806 NW2d 371 (2011). "Generally, a verdict is against the great weight of the evidence only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Anderson*, 341 Mich App 272, 277; 989 NW2d 832 (2022) (quotation marks and citation omitted). Determining whether a verdict is against the great weight of the evidence requires review of "the whole body of proofs." *People v Herbert*, 444 Mich 466, 475; 511 NW2d 654 (1993), overruled in part on other grounds by *People v Lemmon*, 456 Mich 625; 576 NW2d 129 (1998).

Unlike his great-weight challenge, however, defendant was not required to take any action to preserve his insufficient-evidence challenge. See *Williams*, 294 Mich App at 471. In determining whether the evidence is sufficient to sustain a conviction, we review the record evidence de novo in the light most favorable to the prosecution and consider whether it was sufficient "to justify a rational trier of fact in finding guilt beyond a reasonable doubt." *People v Harris*, 495 Mich 120, 126; 845 NW2d 477 (2014). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of a crime, and it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *People v Walker*, 330 Mich App 378, 382; 948 NW2d 122 (2019) (quotation marks, citations, and alteration omitted). It is the jury's role, as factfinder, to determine "the weight of the evidence [and] the credibility of witnesses," *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008), and "a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the jury verdict," *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (quotation marks and citation omitted).

Regarding defendant's challenge to the great weight of the evidence, he argues only that the jury verdict was against the great weight of the evidence because most of the inculpatory evidence was the result of an unconstitutional search of Noles's Malibu and therefore should not have been admitted at trial in the first place. But, as previously discussed, the evidence found in Noles's Malibu was the result of a lawful search and was therefore properly admitted at trial. Defendant does not otherwise assert that the evidence did reasonably not support the jury's verdict or that the verdict "was more likely the result of causes outside the record[.]" *Anderson*, 341 Mich App at 277 (quotation marks and citation omitted).

Regarding his challenge to the sufficiency of the evidence, defendant does not challenge the jury's determination of any particular element of the charged offenses. Rather, defendant argues only that Ridenour's and Detective Shepherd's credibility was deficient and did not sufficiently support the jury verdict. For instance, regarding Ridenour, defendant argues that her "stories ha[ve] not been consistent," noting that she initially told a nurse and the police that she

-13-

and defendant went to the home of defendant's cousin in Paw Paw to purchase the drugs, but she testified at trial that they went to a Wal-Mart parking lot in Paw Paw to purchase the drugs. And regarding Detective Shepherd, defendant similarly argues that his testimony was inconsistent and unreliable, comparing some of the detective's trial testimony to both his testimony at the preliminary examination and to other witnesses' trial testimony to demonstrate the alleged inconsistencies. But it is clear that defense counsel cross-examined both witnesses on the specific inconsistencies alleged by defendant, so all possible inconsistencies were presented for the jury to consider when rendering a verdict. In light of the totality of these witnesses' testimony and the other record evidence, we see no reason to doubt the jury's credibility assessment of Ridenour and Detective Shepherd. See *Oros*, 502 Mich at 239; *Kanaan*, 278 Mich App at 619.

And, regardless of the specific testimony that defendant challenges, there was ample other evidence of defendant's guilt of the charged offenses. The prosecution presented significant physical evidence that was recovered during the execution of the search warrant of defendant's property, which included several firearms, ammunition, more than 10 grams of methamphetamine (in crystal and pill form), small plastic bags, a digital scale with methamphetamine residue on it, and various identifying documents and cards belonging to defendant. Several officers involved in the search of defendant's property also testified about the search and its outcome, and relevant portions of video recordings of the search captured by officers' body-worn cameras were presented to the jury for consideration. More specifically, Detective Shepherd testified that the keys to Noles's Malibu were found in defendant's house, and the black backpack found inside of the white backpack in the trunk of the Malibu contained two of the firearms (both of which were fully loaded), the methamphetamine, the digital scale with methamphetamine residue on it, some small plastic bags, a wallet containing defendant's identification and credit cards, and "[a] green folder with a bunch of identifying documents" belonging to defendant. There was also, as discussed, expert opinion testimony from Lieutenant Yech regarding the evidence found during the search and how it indicated that the methamphetamine at issue "was for sales and distribution." The jury was also presented with several text messages between Ridenour and defendant in which Ridenour asked to purchase cocaine and defendant responded that that he stuck to "ice" because he did not have the "clientele" for cocaine, and testimony from Ridenour and Lieutenant Yech that "ice" was commonly used to refer to methamphetamine.

When reviewing this evidence in a light most favorable to the prosecution, a rational jury could have readily found, based on the evidence and all reasonable inferences arising therefrom, that defendant was guilty of the charged offenses beyond a reasonable doubt. *Harris*, 495 Mich at 126; *Walker*, 330 Mich App at 382. This evidence also reasonably supports the jury verdict. See *Anderson*, 341 Mich App at 277. Accordingly, there was sufficient evidence to support defendant's convictions, and the jury verdict was not against the great weight of the evidence.

## VI. SPEEDY TRIAL

Defendant next argues that he was deprived of his right to a speedy trial. Because defendant did not formally demand a speedy trial below, this issue is unpreserved. *People v Cain*, 238 Mich App 95, 111; 605 NW2d 28 (1999). Unpreserved claims of error are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764. We see no merit in this claim.

A criminal defendant's right to a speedy trial is guaranteed by the United States and Michigan Constitutions, statute, and court rule. See US Const, Am VI; Const 1963, art 1, § 20; MCL 768.1; MCR 6.004(A). "The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006) (quotation marks and citation omitted). To determine whether a defendant has been denied the right to a speedy trial, a court must balance the four factors set forth in *Barker v Wingo*, 407 US 514, 530; 92 S Ct 2182; 33 L Ed 2d 101 (1972): "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 3 (quotation marks and citation omitted). When the length of the delay is less than 18 months, prejudice is not presumed, and the necessity of reviewing the remaining *Barker* factors depends on the circumstances of the case. See *People v Collins*, 388 Mich 680, 688-690; 202 NW2d 769 (1972) (quoting *Barker*, 407 US at 530, for the proposition that " '[u]ntil there is some delay which is presumptively prejudicial there is no necessity for inquiry into the other factors that go into the balance' " and noting that a delay of 18 months or more is presumptively prejudicial). Absent a presumptively prejudicial delay, "the burden is on the defendant to show that he or she suffered prejudice." *Waclawski*, 286 Mich App at 665.

The parties agree that the length of the delay between defendant's arrest and the start of his trial was approximately 16.5 months. Although this delay was significant, it is below the 18-month threshold at which prejudice is presumed. See *Williams*, 475 Mich at 262. Additionally, the record makes clear that this delay was attributable in part to defendant's actions throughout the pretrial proceedings, including his request for an adjournment of his preliminary examination (which was ultimately granted) and his motion to suppress the evidence (which was ultimately denied). See *Cain*, 238 Mich App at 113. The remainder of the delay is "technically attributable to the prosecution" because it was the result of matters such as scheduling delays and docket congestion "inherent in the court system," but those delays "are given a neutral tint and are assigned only minimal weight" in the speedy-trial analysis. *Smith*, ___ Mich App at ___; slip op at 3 (quotation marks and citation omitted). And defendant did not assert his right to a speedy trial, which weighs against him. See *Williams*, 475 Mich at 263.

Finally, regarding prejudice, a defendant may experience two types: "prejudice to his person and prejudice to the defense." *Id*. at 264 (quotation marks and citation omitted). Although both types must be considered, "the most serious inquiry is whether the delay has impaired the defendant's defense." *People v Simpson*, 207 Mich App 560, 564; 526 NW2d 33 (1994). This is because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Williams*, 475 Mich at 264 (quotation marks and citations omitted).

Defendant argues that he suffered prejudice to his person because "oppressive pretrial incarceration" caused him "undue anxiety and concern." While we do not doubt that defendant may well have experienced anxiety from his pretrial incarceration, "anxiety alone cannot establish a speedy-trial violation." *Smith*, ___ Mich App at ___; slip op at 6. And in arguing that he suffered prejudice to his defense, defendant asserts that two potential witnesses—Michael (his brother) and Noles (his brother's girlfriend)—died during the delay, so the "unreasonable delay potentially deprived [him] of exculpatory witnesses." But defendant makes no attempt to explain how these individuals were exculpatory witnesses or how their absence from trial prejudiced his defense. Indeed, defendant does not explain what testimony either of these individuals would have provided

had they been called as witnesses or how (or even if) that testimony would have supported his defense at trial. Nor does defendant offer anything to suggest that he had ever intended on calling these individuals as witnesses at trial. On this record, we cannot conclude that defendant has shown he suffered any prejudice to his defense, let alone prejudice sufficient to entitle him to relief. See *People v Chism*, 390 Mich 104, 115; 211 NW2d 193 (1973) ("[O]n the matter of prejudice to [the] defendant because of the length of time before his trial, the most important thing is that there is no evidence that a fair trial was jeopardized by delay[.]"). Accordingly, defendant's claim of a speedy-trial violation fails. See *Waclawski*, 286 Mich App at 665, 668-669.[9]

## VII. SENTENCE AGREEMENT

In his supplemental Standard 4 brief, defendant also argues that, before trial, the prosecution violated a sentence agreement by reneging on the agreement after defendant had already agreed to its terms and entered a guilty plea on the record. Specifically, defendant asserts that the prosecutor "changed her mind" about the agreement by the time of the sentencing hearing and "made [the] judge change her mind as well," thereby violating the agreement. Because defendant did not raise this issue in the trial court below, the issue is unpreserved. See *People v Solloway*, 316 Mich App 174, 197; 891 NW2d 255 (2016). As already discussed, we review unpreserved issues for plain error affecting substantial rights. See *Carines*, 460 Mich at 763-764.

During pretrial proceedings in this case, the prosecutor made a plea offer to defendant, the terms of which required defendant to plead guilty to an amended count of possession of methamphetamine (first offense) and one count of felon-in-possession in exchange for dismissal of all other charges and a recommendation by the prosecution of a sentence of 12 months in jail. Defendant accepted the offer and subsequently entered his guilty plea on the record. At the ensuing sentencing hearing, however, the prosecutor, despite the agreed-upon promise to recommend 12 months in jail, counseled the court against that sentence. According to the prosecutor, she only offered defendant the deal that she did because she was under the impression that defendant would receive six years' imprisonment for violating the conditions of his parole in Georgia and that the sentencing in this case would run consecutive to that term of imprisonment; after entering into the agreement, however, she learned that defendant would not receive any additional time in Georgia. The prosecutor argued that, based on defendant's "horrible" criminal history, defendant's "many violent felonies," and the particular circumstances of this case, 12 months in jail "is [not] enough time for this Defendant, and [she] would have never made the agreement had [she] know[n] all of the information." In response, defendant asked the court to follow the agreement, arguing that the 12-month jail sentence was appropriate to him as an individual and in light of the particular circumstances of this case. The court ultimately declined to impose a sentence of 12 months in

---

[9] Defendant also argues that his trial counsel was ineffective for failing to file a motion to dismiss based on this claimed speedy-trial violation. For the reasons discussed above, however, defendant's speedy-trial claim lacks merit (even when consideration of his failure to assert his speedy-trial right is set aside). Accordingly, defendant's accompanying claim of ineffective assistance also fails. See *Ericksen*, 288 Mich App at 201.

jail and gave defendant the option either to move forward with sentencing nonetheless or to withdraw his plea. Defendant chose the latter.

We agree with defendant that the prosecutor violated the plea agreement. In essence, the prosecutor's promise to recommend a 12-month jail sentence induced defendant to accept the agreement, and defendant was entitled to have the prosecutor fulfill that promise. See *Santobello v New York*, 404 US 257, 262; 92 S Ct 495; 30 L Ed 2d 427 (1971); see also *People v Nixten*, 183 Mich App 95, 97; 454 NW2d 160 (1990). That said, defendant has failed to show that any additional remedy is required at this stage given that he was already afforded, and took, the opportunity to withdraw his plea. See *Santobello*, 404 US at 263; *Nixten*, 183 Mich App at 97; *People v Ruter*, 177 Mich App 19, 23; 441 NW2d 24 (1989).

In raising this challenge on appeal, defendant fails to acknowledge that, although the prosecutor was bound by the terms of their sentence agreement, the trial court was not. See *Nixten*, 183 Mich App at 97, citing *People v Killebrew*, 416 Mich 189, 207; 330 NW2d 834 (1982). Even if the prosecutor had recommended the 12-month jail sentence as agreed, it was still up to the trial court to decide whether to accept the terms of that agreement. See *People v Williams*, 464 Mich 174, 177; 626 NW2d 899 (2001). And here, irrespective of the prosecutor's arguments against the agreed-upon 12-month jail sentence at the sentencing hearing, the trial court decided that, after its review of the presentence investigation report (PSIR) and defendant's "previous record from out of state," it could not "in good conscience . . . follow the plea agreement" and would instead sentence defendant in accordance with the recommended sentencing guidelines.

Previously, at defendant's plea hearing, the court made very clear to defendant that it would have to review and accept the sentence agreement at the sentencing hearing for defendant to actually receive the agreed-upon sentence, that it was not required to accept the sentence agreement, and that it may not accept the sentence agreement if it determined that the agreed-upon sentence was inappropriate in light of PSIR and the circumstances of the case. The court further informed defendant that if it rejected the agreement, defendant would have the option to either proceed with the sentencing hearing and accept whatever sentence the court believed was appropriate, or withdraw his plea and proceed to trial. This is the circumstance that ultimately unfolded at the sentencing hearing. And when it did, defendant chose to withdraw his plea, and did not seek any other remedy such as requiring specific performance of the agreement by the prosecutor. While defendant may well have preferred that the court accept the sentence agreement, he has not shown that the court's refusal to do so was improper, nor has he shown that he is now entitled to any remedy for the prosecution's violation of the agreement beyond what he has already received. See *Ruter*, 177 Mich App at 23 ("We see no reason why [the] defendant should be entitled to more than one remedy simply because his exercise of the option to the first remedy, i.e., withdrawal of his plea, did not result in a disposition to his liking."). Accordingly, defendant has not demonstrated plain error affecting his substantial rights as to this issue. See *Carines*, 460 Mich at 763-764.[10]

---

[10] On the same basis discussed above, defendant also appears to argue that the prosecutor's violation of the plea agreement amounted to prosecutorial misconduct and that his double-jeopardy

-17-

VIII.  PROPORTIONALITY OF SENTENCE

Lastly, defendant challenges the sentence for his conviction of possession of methamphetamine with intent to deliver, arguing that a term of 260 to 480 months' imprisonment was disproportionate to the offense and the offender.  Because defendant received a within-guidelines sentence, his sentencing challenge is reviewed for reasonableness.  See *People v Posey*, 512 Mich 317, 359-360; 1 NW3d 101 (2023) (*Posey I*).  "[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017).  A proportionate sentence generally considers "the reformation of the offender, the protection of society, the discipline of the offender, and the deterrence of others from committing the same offense."  *People v Boykin*, 510 Mich 171, 183; 987 NW2d 58 (2022).  Other relevant factors to be considered include:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation.  [*People v Walden*, 319 Mich App 344, 352-353; 901 NW2d 142 (2017) (quotation marks and citation omitted).]

A within-guidelines sentence is presumptively proportionate, and "the defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate."  *Posey I*, 512 Mich at 359.

In this case, defendant argues that the trial court "did not treat the [sentencing] guidelines as a 'highly relevant consideration' " as it was required to do and instead simply ignored them.  According to defendant, this was evident from the fact that the court initially sentenced him to a minimum of 360 months, and only changed the minimum sentence to 260 months when the prosecution indicated that a 360-month minimum would constitute an upward departure.  As the court made clear at the sentencing hearing, however, the court simply misspoke in initially mentioning a 360-month rather than 260-month minimum sentence, and the record does not

---

rights were violated as a result of the prosecution's actions.  But defendant does not provide any meaningful argument or identify any factual or legal support for either of these claims.  See *Burkett*, 337 Mich App at 639 n 4.  Nor, for that matter, do the claims appear to have merit.  Regarding his prosecutorial-misconduct claim, for the reasons discussed above, defendant has not established plain error affecting his substantial rights given that he was afforded the opportunity to withdraw his plea and proceed to trial, which he did.  See *Carines*, 460 Mich at 763-764.  And regarding his double-jeopardy claim, double-jeopardy guarantees do not prevent the prosecution from reinstituting charges that were dismissed as part of plea bargain if the bargain is withdrawn.  *People v Siebert*, 201 Mich App 402, 424-425; 507 NW2d 211 (1993).  Again, defendant opted to withdraw his plea and proceed to trial when offered the chance to do so.

support defendant's suggestion that the court ever actually intended to sentence defendant to a 360-month minimum, or that the court failed to give due regard to the guidelines in imposing its sentence.

In any event, defendant has not overcome the presumption that his within-guidelines sentence is reasonable and proportionate. Contrary to defendant's suggestion on appeal, the court's sentence was not based solely on the offense at issue in this case, but also on defendant's broader and persistent history of criminal behavior and the ongoing threat it posed to the community. As the court explained in imposing its sentence, defendant had "quite a record" and "this behavior really poses a threat to the community, and . . . needs to be dealt with." The record amply supports these findings. In addition to the conduct at issue in this case, defendant's PSIR indicated that he had eight prior felony and four prior misdemeanor convictions, several of which were violent, and that defendant was on parole in Georgia when he committed the instant sentencing offense. Defendant does not address the court's reasoning or explain why the presumption of his sentence's proportionality does not hold up in light of it. See *Posey I*, 512 Mich at 359; see also *People v Posey (On Remand)*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 345491); slip op at 4 (noting generally that "there is nothing in *Posey* [*I*] suggesting that a sentencing court needs to expressly explain why a within-guidelines sentence is reasonable and proportionate" and deeming the court's discussion of the imposed sentence in that case sufficient to facilitate appellate review). Nor, for that matter, does defendant challenge the court's scoring of the sentencing variables, all of which accounted for the circumstances surrounding the offense and the offender, consistent with the principle of proportionality. See *People v Dixon-Bey*, 321 Mich App 490, 524; 909 NW2d 458 (2017).

In sum, defendant has not overcome the presumption that his within-guidelines sentence was reasonable and proportionate and, accordingly, he has not demonstrated that he is entitled to sentencing relief. See *Posey I*, 512 Mich at 359; *Steanhouse*, 500 Mich at 459-460.

Affirmed.

/s/ Anica Letica
/s/ Michael J. Kelly
/s/ Philip P. Mariani